UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| CHENETHA LINDSEY, ] | |
| ] | |
|     Plaintiff, ] | |
| ] | |
| v. ] | CIVIL ACTION NO. |
| ] | 4:15-CV-01528-KOB |
| THE BRIDGE REHAB, INC., ] | |
| ] | |
|     Defendant. ] | |

## MEMORANDUM OPINION

This Title VII religious discrimination case comes before the court on Defendant The Bridge Rehab, Inc.'s motion for summary judgment.  (Doc. 41).

Plaintiff Chenetha Lindsey contends that The Bridge changed her work status from part-time to "as needed" and terminated her because of her religion. She also contends that The Bridge failed to accommodate her desire to share her faith with clients.

The Bridge tells another story.  It asserts that it changed Ms. Lindsey's work status because she failed to complete required training and terminated her because she failed to communicate with her supervisor.  Though it counseled Ms. Lindsey against what it characterizes as "forcing" her religion on The Bridge's clients, The Bridge maintains that it did not discriminate against Ms. Lindsey for being Christian and could not reasonably accommodate the extent to which Ms. Lindsey

1

desired to express her faith with its clients.

As further explained below, the court will GRANT The Bridge's motion for summary judgment. No direct evidence of religious discrimination exists and Ms. Lindsey has failed to state a *prima facie* case of religious discrimination based on circumstantial evidence. Even if she had stated a *prima face* case, her claim fails because no evidence supports a finding that The Bridge's reasons for changing her work status and terminating her are pretext for discrimination. And no genuine issue exists that The Bridge did not discriminate against Ms. Lindsey by failing to accommodate the extent to which she desired to express her religious beliefs.

I.  STANDARD OF REVIEW

A trial court can resolve a case on summary judgment *only* when the moving party establishes two essential elements: (1) no genuine disputes of material fact exist; *and* (2) the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

Under the first element of the moving party's summary judgment burden, "'[g]enuine disputes [of material fact] are those in which the evidence is such that a reasonable jury *could* return a verdict for the non-movant.'" *Evans v. Books-A-Million*, 762 F.3d 1288, 1294 (11th Cir. 2014) (emphasis added) (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)). And when considering whether any genuine disputes of material fact exist, the court must

view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).

Inferences drawn from *facts* can create genuine issues to defeat a motion for summary judgment. *Carlson v. FedEx Ground Package Sys., Inc.*, 787 F.3d 1313, 1318 (11th Cir. 2015). Conclusory allegations cannot. *See Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995).

**II. FACTS**

The Bridge is an Alabama non-profit corporation founded as a Christian-based mission that offers residential care and outpatient treatment for adolescents in need of substance abuse and behavioral modification treatment programs.

Ms. Lindsey, a Christian, worked as a treatment aide at The Bridge, first from June 2013 to February 2014, and then from September 2014 to December 1, 2015. As a treatment aide, Ms. Lindsey supervised clients' safety and conducted basic living skills group instruction sessions.

The court will present the facts of this case in the light most favorable to Ms. Lindsey under three general categories: (1) the training requirements at The Bridge; (2) Ms. Lindsey's expression of her faith with clients; and (3) the events surrounding Ms. Lindsey's termination on December 1, 2015.

### A. Training Requirements at The Bridge

Ms. Lindsey first worked as a part-time treatment aide at The Bridge from June 2013 to February 2014. Before beginning her employment, she completed a mandatory two-week training course. She voluntarily left The Bridge in February 2014 because she was pregnant.

She returned to The Bridge as a part-time treatment aide in September 2014. This time around, The Bridge required treatment aides to complete ongoing training sessions during their employment, not just the initial two-week training course. (*See* Doc. 42-2 at 17; Doc. 42-18 at 7; Doc. 42-19 at 19; Doc. 42-20 at 2; Doc. 42-22 at 6, 13).

Ms. Lindsey did not attend any training sessions during her second tenure at The Bridge until March 11, 2015. (Doc. 42-2 at 20). On March 11, 2015, she attended training courses on managing difficult behaviors and cultural diversity. (*Id.* at 103–10). The Bridge offered those courses as part of the initial two-week training that Ms. Lindsey should have completed when she began her second employment with The Bridge in September 2014. (*Id.* at 19). The Bridge's program manager, Martell Hall, mistakenly told her not to complete the two-week training program when she began her second employment because she had completed it when she began her first tenure with The Bridge. (*Id.* at 16–17, 19).

Ms. Lindsey did not participate in any further training after March 11, 2015.

(Doc. 42-2 at 22).

On March 16, 2015, The Bridge placed Ms. Lindsey on PRN status—that is, on an "as needed" basis. (Doc. 42-21). Mr. Hall testified that The Bridge changed her to PRN so Ms. Lindsey could complete her training requirements. (Doc. 42-19 at 12).

Ms. Lindsey, on the other hand, testified that The Bridge changed her to PRN because she shared her faith with clients. (Doc. 42-2 at 22–23). So the court turns next to the facts of Ms. Lindsey's religious expression.

### B. Ms. Lindsey's Expression of her Faith with Clients

Around February 2015, concerns arose at The Bridge regarding the way Ms. Lindsey shared her faith with clients. Several clients complained that Ms. Lindsey forced her religion on them by aggressively talking about her beliefs when they did not welcome it. (*See* Doc. 42-10 at 2; Doc. 42-18 at 6; Doc. 42-19 at 1). Ms. Lindsey's supervisor, Sharon Wallace, reported to Mr. Hall that Ms. Lindsey "forc[ed]" and "initializ[ed] Bible classes and conversations with the clients," and that some clients wanted to leave the group sessions because they felt Ms. Lindsey was "always trying to force" her religion on them. (Doc. 42-10 at 2). And Mr. Hall testified that clients complained that Ms. Lindsey "was forcing [her religion] on them" by "talking about it when they didn't want to talk about it, coming into the dorm rooms talking about it, you know, talking about hell, and things like

5

that." (Doc. 42-19 at 11).

In February 2015, Mr. Hall met with Ms. Lindsey to explain different approaches that she could take in discussing her faith with clients and asked her to be sensitive and respectful to the clients' wishes and beliefs. (Doc. 42-19 at 11, 19). Ms. Lindsey responded that she would continue to do what she wanted because God told her to do so. (Doc. 42-2 at 36; Doc. 42-10 at 2; Doc. 42-18 at 6; Doc. 42-19 at 19).

Then, a client named Z.P. filed a complaint with The Bridge that Ms. Lindsey entered his dorm room and told him, "stop talking to others about your religion because it's wrong and your religion is wrong." (Doc. 42-11 at 3). At her deposition, Ms. Lindsey admitted that she told Z.P. that "what he was saying to another client about God was wrong" and that she was "a messenger from God." (Doc. 42-2 at 23). Though the record does not show on what date the incident occurred, Z.P. signed his complaint form on March 18, 2015, two days after The Bridge changed Ms. Lindsey to PRN. (Doc. 42-11 at 2).

On March 18, 2015, Ms. Lindsey met with Mr. Hall to discuss her change to PRN status. At the meeting, Mr. Hall informed Ms. Lindsey about Z.P.'s complaint. Ms. Lindsey told Mr. Hall that she would continue doing what God wanted her to do. (Doc. 42-2 at 26; Doc. 42-12).

6

### C. Events Surrounding Ms. Lindsey's Termination

Ms. Lindsey worked her last shift at The Bridge on March 18, 2015, but the Bridge did not terminate her until December 1, 2015. (Doc. 42-14). Between those times, Ms. Lindsey remained on PRN status. And, at least on one occasion, The Bridge asked her to work but she declined. (*See* Doc. 42-2 at 15).

At some point after March 18, 2015, Ms. Lindsey changed her cell phone number. (Doc. 42-2 at 26–27). Though The Bridge had always contacted Ms. Lindsey by cell phone, she never informed The Bridge that she changed her number. (*Id.*). So, as Ms. Lindsey admitted at her deposition, "if [The Bridge was] looking for [her] to come and work, [The Bridge] would have not had a way to contact [her]." (*Id.* at 27).

Ms. Wallace attempted to contact Ms. Lindsey approximately three times while Ms. Lindsey was on PRN status. (Doc. 42-18 at 9). Ms. Wallace never received an answer and Ms. Lindsey never communicated with The Bridge.

Mr. Hall testified that if The Bridge could not reach an employee after attempting to contact her two or three times, The Bridge would remove the employee from the PRN list and terminate her. (Doc. 42-19 at 12). So, on December 1, 2015, the Bridge terminated Ms. Lindsey's employment. On the separation form, Mr. Hall wrote: "Ms. Lindsey was contacted on multiple occasions regarding her work status, however she failed to return calls or

7

communicate with [her] supervisor or program manager." (Doc. 42-14 at 2).

## III. ANALYSIS

From the facts discussed above, Ms. Lindsey brings a claim of religious discrimination against The Bridge under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* In her amended complaint, she contends that The Bridge changed her work status from part-time to PRN and terminated her because of her religion. (Doc. 6).

A plaintiff can bring a Title VII religious discrimination claim based on disparate treatment and/or a failure to accommodate her religious beliefs. *Johnson v. AutoZone, Inc.*, 768 F. Supp. 2d 1124, 1136 (N.D. Ala. 2011). Ms. Lindsey asserts both theories of religious discrimination in this case.

### A. **Religious Discrimination - Disparate Treatment**

#### 1. Direct Evidence

Ms. Lindsey first contends that she has presented direct evidence of religious discrimination. (*See* Doc. 46 at 8–9). A plaintiff's discrimination claim will survive summary judgment *if* direct evidence creates a triable issue of whether she suffered an adverse employment action because of a protected characteristic. *Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1081 (11th Cir. 2005). The Eleventh Circuit defines direct evidence in the employment discrimination context as "evidence which reflects a discriminatory . . . attitude correlating to the

discrimination . . . complained of by the employee," or, evidence that "proves [the] existence of [a] fact without inference or presumption." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (citations and quotations omitted). No such evidence exists in this case.

Ms. Lindsey points to the facts that she shared her religion with clients, used her Bible in group sessions, and that The Bridge counseled her against the way she shared her religion as direct evidence of discrimination. But those facts do not prove the existence of a discriminatory purpose without inference in placing her on PRN status or terminating her. Accordingly, Ms. Lindsey relies on circumstantial evidence, not direct evidence. *See Wilson*, 376 F.3d at 1086 (finding that circumstantial evidence "suggests, but does not prove, a discriminatory motive").

2. <u>Circumstantial Evidence</u>

A plaintiff may use the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to establish a Title VII religious discrimination claim based on circumstantial evidence. *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1527 (11th Cir. 1997). Under this framework, a plaintiff first must establish a *prima facie* case of discrimination. A plaintiff succeeds at this step by showing that (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) she was treated less favorably than a similarly-situated individual outside of her

protected class. *Maynard v. Bd. of Regents of Div. of Fla. Dept. of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802).

If the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse employment action. *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001). The defendant's burden is light; the defendant must only produce a reason, not persuade the court that the reason was the defendant's actual reason for the adverse employment action. *Id.* at 1242–43.

Once the defendant carries its minimal burden, the plaintiff must raise a genuine issue that the defendant's "proffered reason really is a pretext for unlawful discrimination" to survive a motion for summary judgment. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 (11th Cir. 2008) (internal quotation marks and citations omitted). The plaintiff can show a genuine issue of pretext by identifying "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (citation and internal quotation marks omitted). If the plaintiff carries her burden of showing pretext, then she will survive summary judgment. *See id.*

### a. *Prima facie* case

Here, Ms. Lindsey has satisfied the first three elements of her *prima facie* case. As a Christian, she belongs to a protected class. No dispute exists over Ms. Lindsey's qualifications to work as a treatment aide, subject to her completion of ongoing training. And she suffered two adverse employment actions when The Bridge cut her hours from part-time to PRN and then terminated her. But she has *not* satisfied the fourth element of her *prima facie* case because she has not identified a non-Christian whom The Bridge treated less favorably or any other circumstances from which a jury could infer discrimination.

Ms. Lindsey identifies only one comparator: her supervisor, Sharon Wallace. Like Ms. Lindsey, Ms. Wallace "would express and talk about religious matters" with clients and "would pray for"—and presumably with—"the kids." (Doc. 42-2 at 28). But, fatal to Ms. Lindsey's claim, Ms. Wallace is also a Christian. (*Id.*). Thus, Ms. Wallace is not "a similarly-situated individual *outside* of [Ms. Lindsey's] protected class" as required under the fourth element of her *prima facie* case. *See Maynard*, 342 F.3d at 1289 (emphasis added).

Realizing this problem, Ms. Lindsey attempts to differentiate herself by stating that she "belongs to the Apostolic Overcoming Holy Church of God denomination, which is a Protestant Pentecostal based denomination[,] and Ms. Wallace belongs to the Apostolic faith[,] which is a Christian based

denomination." (Doc. 46 at 11). According to Ms. Lindsey, "this difference in denominations is strong enough to determine that Ms. Wallace is outside of Plaintiff's protect[ed] class." (*Id.* at 11–12). Ms. Lindsey is splitting hairs.

The court only has before it Ms. Lindsey's conclusory allegation that Ms. Wallace is outside of her protected class by being a member of a different Christian denomination. No record evidence exists of the differences between the two denominations. No evidence exists regarding whether Ms. Lindsey expressed herself differently than Ms. Wallace as a member of a "Protestant Pentecostal based denomination" as opposed to a "Christian based denomination." And no record evidence exists of whether The Bridge was aware—or should have been aware—of to which denominations the two employees belonged. The court cannot determine the existence of any factual disputes as to whether Ms. Wallace is outside Ms. Lindsey's protected class without any facts. And the court cannot add its own facts or speculation to the record.

Nor does Ms. Lindsey cite any legal authority for the proposition that different denominations of Christianity are categorically *different protected classes* for purposes of Title VII, and the court is not aware of any such authority. That said, Title VII defines "religion" as "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). Even assuming that different denominations of Christianity *could* constitute different "aspects of religious

observance and practice" such that disparate treatment of employees from different denominations *could* be discrimination on the basis of religion, no record evidence exists of the different observances, practices, and beliefs between the two specific denominations in this case. And while a plaintiff would not necessarily have to present evidence of the differences between, for example, Christianity and Islam to show that Christians and Muslims belong to different protected classes, the court cannot say that the same categorical distinction applies to different Christian denominations without any supporting evidence.

Alternatively, putting aside Ms. Wallace, Ms. Lindsey suggests that The Bridge *might* have replaced her with someone outside of her protected class after The Bridge terminated her. (Doc. 46 at 12). *If* The Bridge replaced her with a non-Christian, Ms. Lindsey *might* have circumstantial evidence to state a *prima facie* case. *See Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004) (finding that a plaintiff can satisfy the fourth element of her *prima facie* case of discriminatory discharge by showing that her employer replaced her with someone outside her protected class). But, as Ms. Lindsey admits, whether The Bridge replaced her with a non-Christian—or anyone—is unknown. (Doc. 46 at 12).

Thus, Ms. Lindsey has failed to state a *prima facie* case of disparate treatment based on circumstantial evidence.

### b. *Legitimate non-discriminatory reason and pretext*

Even if Ms. Lindsey had stated a *prima facie* case, her claim would still fail because no genuine dispute exists that The Bridge's legitimate non-discriminatory reasons for changing her to PRN and terminating her are pretext for discrimination.

The Bridge contends that it changed Ms. Lindsey to PRN so that she could catch up on several training requirements. And it contends that it terminated her because she did not answer The Bridge's calls or communicate with her supervisors while on PRN status. Thus, The Bridge has carried its minimal burden of articulating a legitimate non-discriminatory reason for its actions.

And Ms. Lindsey has failed to carry her burden of showing that The Bridge's reasons are pretext for discrimination. As to the change to PRN, Ms. Lindsey contends that she had already completed her training during her first tenure with The Bridge. (*See* Doc. 46 at 16). But she misses the point. No dispute exists that, during her second tenure at The Bridge, she had to complete *additional ongoing* training. (*See* Doc. 42-2 at 17; Doc. 42-18 at 7; Doc. 42-19 at 19; Doc. 42-22 at 6, 13). And no dispute exists that she did not complete this training. (*See* Doc. 42-2 at 20–22; Doc. 42-19 at 12). So Ms. Lindsey casts no doubt on The Bridge's reason for changing her to PRN.

As to her termination for not communicating with her supervisors, Ms. Lindsey points to the fact that Ms. Wallace "couldn't recall if she ever left a

14

message for [Ms. Lindsey]." (Doc. 46 at 16). But this fact makes no difference; no dispute exists that The Bridge tried to contact Ms. Lindsey and Ms. Lindsey never communicated with them.

Ms. Lindsey also asserts, without citing to the record, that she only changed her phone number after The Bridge did not contact her for several months while she was on PRN. (Doc. 46 at 16). Even if the record supported this assertion, it does not raise a genuine issue of pretext. Again, no dispute exists that The Bridge tried to contact Ms. Lindsey and Ms. Lindsey never communicated with them.

Finally, to the extent that Ms. Lindsey uses the fact that The Bridge counseled her against the way she shared her faith as evidence of pretext, she still has not satisfied her burden. The Bridge—which was founded as a Christian-based mission—only discouraged Ms. Lindsey from the forceful *manner* by which she expressed her religion and made clients uncomfortable. Ms. Wallace and Mr. Hall did not tell her that she could not share her faith. Rather, they encouraged her to share her religion respectfully when clients welcomed it. (Doc. 42-19 at 9, 17). They only told her to not "force" it on clients and to be respectful and sensitive to the clients' beliefs. (*See id.* at 11, 19). Also, Z.P.'s complaint that Ms. Lindsey disrespected his religious beliefs in his dorm room is dated March 18, 2015, two days *after* the Bridge placed her on PRN status. (Doc. 42-11 at 2). And no dispute exists that The Bridge still called Ms. Lindsey to ask her to work after placing her

on PRN. (*See* Doc. 42-2 at 15; Doc. 42-18 at 9). So Ms. Lindsey has not identified any inconsistencies with or cast any doubt on The Bridge's reasons for its actions and has thus failed to establish pretext.

The court will grant the motion for summary judgment as to Ms. Lindsey's disparate treatment claim because she has failed to state a *prima facie* case of religious discrimination and raise a genuine issue of pretext.

**B.** **Religious Discrimination - Failure to Accommodate**

A plaintiff can also state a claim of religious discrimination if she shows that her employer failed to reasonably accommodate her religious beliefs. *Beadle v. Hillsborough Cty. Sheriff's Dep't*, 29 F.3d 589, 592 n.5 (11th Cir. 1994). To do so, the plaintiff must first establish a *prima facie* case by showing that she (1) "had a bona fide religious belief that conflicted with an employment requirement"; (2) "informed [her] employer of [her] belief"; and (3) suffered an adverse employment action for "failing to comply with the conflicting employment requirement." *Id.*

If the plaintiff states a *prima facie* case, then the burden shifts to the defendant to show "(1) that it did (or offered to) reasonably accommodate the plaintiff's religious needs . . . or (2) that it could not reasonably accommodate the plaintiff's religious needs without undue hardship." *Breech v. Alabama Power Co.*, 962 F. Supp. 1447, 1460 (S.D. Ala. 1997), *aff'd sub nom. Breech v. Alabama Power*, 140 F.3d 1043 (11th Cir. 1998) (citing *Ansonia Bd. of Educ. v. Philbrook*,

479 U.S. 60, 68–69 (1986)). And the Supreme Court "has described 'undue hardship' as any act requiring an employer to bear more than a '*de minimis* cost' in accommodating an employee's religious beliefs. The Court has also recognized that the phrase '*de minimis* cost' entails not only monetary concerns, but also the employer's burden in conducting its business." *Beadle v. City of Tampa*, 42 F.3d 633, 636 (11th Cir. 1995) (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 n.15 (1977)).

Here, Ms. Lindsey claims that The Bridge failed to accommodate her religious beliefs by not allowing her to share her faith with clients. But her claim fails because The Bridge could not reasonably accommodate the *extent or manner* to which she wanted to express her faith without undue hardship.

The Bridge never prohibited Ms. Lindsey from *sharing* her religious beliefs with clients. In fact, Mr. Hall testified that treatment aides sometimes had to discuss their faith and that The Bridge encouraged treatment aides to discuss their faith when clients invited or welcomed it. (Doc. 42-19 at 9, 17). Instead, The Bridge prohibited Ms. Lindsey from *forcing* her religious beliefs on its clients.

Some of The Bridge's clients wanted to leave the group counseling sessions because they felt that Ms. Lindsey was forcing her religious beliefs on them at the sessions. (Doc. 42-10 at 2). Several clients complained that Ms. Lindsey aggressively talked about her faith and made them uncomfortable. (Doc. 42-9 at

17

11, 19). Ms. Wallace reported that Ms. Lindsey "forc[ed]" and "initializ[ed] Bible classes and conversations with the clients" without invitation. (Doc. 42-10 at 2). And Ms. Lindsey entered a client's dorm room and told him that she came to him as "a messenger of God" to say "what he was saying to another client about God was wrong." (Doc. 42-2 at 23).

The Bridge would jeopardize its mission to provide substance abuse and behavioral treatment to vulnerable adolescents if it permitted Ms. Lindsey to *forcefully* express her religion and disrespect the clients. So The Bridge would suffer more than a "*de minimis* cost" and enlarge its "burden in conducting its business" by providing the accommodation Ms. Lindsey desired. *See Beadle*, 42 F.3d at 636; *cf. Knight v. Connecticut Dep't of Pub. Health*, 275 F.3d 156, 168 (2d Cir. 2001) ("[T]he accommodation they now seek is not reasonable. Permitting appellants to evangelize while providing services to clients would jeopardize the state's ability to provide [medical] services in a religion-neutral matter.").

Thus, the court finds that Ms. Lindsey's failure to accommodate claim fails because The Bridge could not reasonably allow Ms. Lindsey an unlimited opportunity to express her faith regardless of the effect on clients.

IV. **CONCLUSION**

No genuine issues of fact exist to support Ms. Lindsey's religious discrimination claim based on disparate treatment or failure to accommodate and

18

The Bridge is entitled to judgment as a matter of law. So, by separate order, the court will **GRANT** The Bridge's motion for summary judgment.

**DONE** and **ORDERED** this 18th day of March, 2019.

_____
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE